TILGHMAN v. PAXSON CO.

SAME v. FOUNDRY CO.

(Circuit Court, E. D. Pennsylvania. May 15, 1902.)

Nos. 2, 3.

---

In re TUNE.

((District Court, N. D. Alabama, N. D. May 19, 1902.)

1. EXEMPTIONS—EFFECT OF WAIVER IN NOTE.

Under the laws of Alabama, a waiver of exemptions in a promissory note does not amount to a lien or pledge of any of the debtor's exempt property, or confer any estate or interest in it. The waiver may bring an estoppel into play, but only after judgment and execution on the debt.

2. BANKRUPTCY—PROTECTION OF BANKRUPT'S RIGHT TO DISCHARGE.

The court of bankruptcy should see to it, pending a discharge, that remedies for the collection of debts from which the discharge might absolve the debtor shall not be perfected so as to condemn exempt property in satisfaction of debts, from which the discharge is intended to free it.

3. SAME—ATTACHMENT LIENS.

Subdivision "c" is destroyed by subdivision "f" of section 67 of the bankrupt law, and the latter is the only law regarding liens of attachment obtained against the insolvent within four months of the adjudication.

**4. Same—Exempt Property.**

Whatever benefit results from the annulment of attachment liens extends to exempt property as well as to that which is not exempt. It is the policy of the law to allow the bankrupt, as well as creditors, to benefit by the changed status.

**5. Same—Effect of Adjudication.**

An attachment in a suit to collect a simple contract debt can create a lien only when perfected by a valid judgment of condemnation. It is a lien "obtained through legal proceedings," and, when the insolvent debtor is adjudicated a bankrupt, the bankrupt law annuls it, subject to the provisions of section 67f.

**6. Same—Attached Property—Loss of Jurisdiction by State Court.**

When the only right of possession by a state court of attached property is based on an attachment lien, which is annulled by the adjudication in bankruptcy, the state court loses all jurisdiction of the rem, which is transferred into the exclusive jurisdiction of the court of bankruptcy. There is no longer any right of possession in the officer of the state court, who then holds as bailee for the person rightfully entitled to possession, and becomes a trespasser if he fails to deliver on proper demand.

**7. Same—Pleading Adjudication in Bar.**

If, after suit brought in such case, and before judgment, the adjudication is timely and properly pleaded, the only remaining jurisdiction in the attaching court is to stay suit, and await the determination as to the discharge. If discharge is granted and pleaded, the only jurisdiction is to dismiss or render judgment for the defendant. If the discharge is not granted, or granted and not pleaded, the court can render judgment in personam; since the res was transferred by the adjudication to the exclusive jurisdiction of the court of bankruptcy, and its jurisdiction over the rem is in no wise affected by the discharge or refusal to discharge.

**8. Same—Jurisdiction of Bankruptcy Court—Adverse Claims to Property.**

The various decisions of the supreme court examined and reviewed. The result *held* to be that a court of bankruptcy may inquire in a summary way as to an adverse claim, made by a stranger, to the property, which belongs to the bankrupt. If it appears that the claim is manifestly without foundation, it may order the property turned over to the trustee, and punish refusal as a contempt, without compelling the trustee to resort to a plenary suit to recover the property.

**9. Same.**

The summary jurisdiction is ousted if determination of the validity of the adverse claims involves the decision of matters in pais and the weighing of conflicting evidence and finding of facts, which, when presented, leave room for fair doubt as to the invalidity of the claim, since such a claim is not merely colorable. Delivery must then be compelled by suit in plenary proceedings in a proper court.

**10. Same—Parties and Procedure—Injunction.**

If, after attachment, and before judgment, the insolvent is adjudicated a bankrupt within four months, etc., and properly pleads the discharge, but the state court refuses to regard it, and nevertheless renders judgment of condemnation, and directs a sale of the property, the receiver or trustee is entitled to an injunction and mandatory order to its officer to surrender possession; but there should first be a rule to show cause on petition, to which the parties affected should be made defendants, and an opportunity given them to be heard, before injunction issues; though, if the exigency is pressing, a temporary restraining order may be made until the matter can be heard.

**11. Federal and State Courts—Priority of Jurisdiction—Transfer of Jurisdiction by Operation of Law.**

In cases of concurrent jurisdiction the court first obtaining possession of the property administers it; but where that court loses jurisdiction, and it is transferred by operation of valid laws to a court of the United

States, which has exclusive jurisdiction of the subject-matter, the question becomes one of obedience to the paramount authority of the constitution, and comity can have no influence in determining the right.[1]

**12. BANKRUPTCY—POWERS OF COURT—ENFORCING RIGHT TO PROPERTY.**

Where an attachment issued from a justice court and levied on defendant's property is annulled by operation of the bankruptcy law, and the defendant duly pleads the adjudication, but the justice disregards it, and gives judgment of condemnation, and orders a sale of the property, which, by operation of law, has passed into the exclusive jurisdiction of the court of bankruptcy, such court is not required by considerations of comity to ask the justice to make a proper order on the constable to surrender, before making its own order directing the marshal to seize the property.

(Syllabus by the Court.)

In Bankruptcy.   On review of questions certified by referee.

James Harlan and S. M. Sloan, each of whom were holders of notes waiving exemptions, commenced suits against Tune by attachment on February 15, 1902, to collect their debts, suits being returnable on the 22d day of February, 1902. Tune filed a voluntary petition on the 17th day of February, 1902, and the next' day was duly adjudicated a bankrupt. In his schedule Harlan and Sloan were listed as creditors. Tune, in his petition, claimed the raft of logs and some household and kitchen furniture, in all worth about $400, as exempt. On the same day the bankrupt petitioned for the appointment of a receiver to take possession of the logs, averring "that the logs were rafted, and ready to be shipped, and liable to be stolen or taken away and greatly depreciated in value; that, in order to conserve the property, it was necessary that a receiver be appointed to hold the property until a trustee was appointed." A receiver was appointed and qualified immediately. The petition further shows that on the day set for hearing the bankrupt appeared before the justice, and when the cases were called for trial, before judgment was rendered, properly pleaded adjudication, a duly certified copy of which was made a part of the plea. The justice declined to allow the plea, but stated he would delay a few days to inform himself further. On the next day, as the petition avers, the justice rendered judgment, and ordered the raft of logs to be sold for the satisfaction of the judgment. It appears from the record that, although the justice refused to hold up judgment of condemnation, the judgment contained a stay of execution for 30 days. The petition avers the receiver demanded the property from the constable, but the latter, being indemnified by the plaintiffs, refused the demand, and insisted on selling the logs, and the justice ordered him to retain possession and sell the same for the satisfaction of the judgment. With or without reference to the adjudication, passed three days after the suit was commenced, the evidence abundantly shows that Tune was insolvent at the time of the levy, and for many months prior thereto. The petition prayed, in substance, an injunction against the creditors and the justice from taking further proceedings, and that all of them be enjoined from interfering with the receiver, and that the creditors and constable be required to deliver the raft of logs to the receiver, and that he be put in possession by proper process. This petition was sworn to, but the persons mentioned in it were not made parties, and it does not appear to have been served upon them, or that they had any notice of it other than was conveyed by the order afterwards made by the referee, Murphy. On the 26th day of February, 1902, the referee made an order in substance enjoining the constable, justice, and creditors "from taking possession of or retaining under their control any property the bankrupt owned on the 18th day of February, 1902, and particularly the raft of logs, and ordered them without delay to deliver possession to the receiver." It contained a sweeping injunction

---

[1] Conflicting jurisdiction of federal and state courts, see notes to Louisville Trust Co. v. City of Cincinnati, 22 C. C. A. 356, and Plow Works v. Finks, 26 C. C. A. 49.

against the creditors, forbidding the prosecution of the attachment suit in the justice court or having any process thereon issued against the bankrupt or any of his property, and from making any sale of the property, or removing the same, or from receiving any money, the proceeds of the sale of the property of the bankrupt; and the justice was ordered to vacate the judgment made by him, and all orders made since the 18th of February, 1902. It was further ordered that the marshal put the receiver in possession of the property. On the 19th day of March, 1902, Harlan and Sloan proved their claims against the bankrupt. On the same day, without making any answer to the petition, they appeared, and without any protest as to the jurisdiction moved to dissolve the order, and to have the raft of logs returned to the constable, on the ground that the attachment was a lien upon the raft at and before the filing of the bankrupt's petition, and the right to enforce the attachment was properly triable before the state court, and there was no ground for the appointment of a receiver. In support of this motion Harlan and Sloan proved that for more than 10 years past Tune had never owned as much as $500 worth of property,—that the attachment suits were brought because Tune was about to move the raft of logs out of the state; that at the time of the attachment bankruptcy proceedings had not been instituted; that, so far as creditors knew or believed, Tune had not contemplated bankruptcy at the time the attachment was sued out and levied. It does not appear, except inferentially, from the testimony taken on the hearing, that the raft of logs was finally delivered to the receiver under the order; but it appears that it was, from other parts of the record, and the prayer of the creditors to have it returned to the constable. On the hearing, the referee refused to vacate or modify the order, and the creditors excepted.

Kirk, Carmichael & Rather, for creditors.
S. S. Pleasants, for trustee.

JONES, District Judge (after stating the facts). In Re Moore (D. C.) 112 Fed. 290, it was held that the waiver of exemption authorized by the laws of this state could not of itself confer any title, interest, or equity in the property of the debtor, and did not constitute a lien or pledge in any sense. That case differs from this, in that there the exempt property was claimed before a judgment or attachment. In view of the argument of counsel and the effect claimed for the levy on the exempt property in this case, some further discussion of the case seems proper.

The whole office and effect of a waiver of exemptions is to build up an estoppel which is quickened into being only by a judgment on the debt and the issue of execution in the statutory mode. An estoppel to claim property does not give the person in whose favor the estoppel runs a lien on that property. The judgment and execution alone give the waiver any operation; and the combined effect of the debt, waiver, judgment, and execution, so far as they give any virtue to the waiver, is merely to bring the estoppel into play. If any lien arises in this case it is because of a levy, if that levy can be lawfully followed by a judgment of condemnation. Any legal obstacle interposed between the levy and the right of judgment, so as to defeat condemnation, keeps the waiver in the background, and renders it wholly without influence. No lien in a suit on a simple contract debt can ripen from a levy of an attachment, unless that levy can be followed by a judgment of condemnation. Liens thus obtained are "obtained through legal proceedings," and are the mere creatures of proceedings in court. The preservation of the levy under the at-

tachment is essential to the right of the creditors to subject the property in this case. The question then arises, was the attachment lien dissolved by the adjudication? It is urged that a court of bankruptcy cannot concern itself with liens upon exempt property, or their enforcement. It cannot be denied that it ought to view with concern an attempt to create a lien upon exempt property pending discharge. It is its duty to see that legal remedies for collection of debts, from which discharge may absolve, shall not be allowed to create liens upon property set apart to the bankrupt, so as to nullify the policy of the law, by subjecting the exempt property to debts from which the discharge intended to free it. It is insisted that, as the raft of logs was exempt property, the provisions of the bankrupt act annulling attachments and liens cannot affect the levy in this case, as those provisions were made for the benefit of creditors who cannot share in the exempt property, and no disposition the debtor may make or suffer to be made can amount to a preference. All enlightened governments endeavor to guard against the distressing consequences resulting from the inexorable collection of debt, the enforcement of which shapes in so many ways the condition and destiny of the debtor, by granting liberal exemptions, and providing for periodic discharge from debt. To accomplish these results, the bankrupt law not only relieves the debtor from all debts, with a few exceptions, but to all intents and purposes makes the bankrupt a creditor with a lien, so to speak, and prefers him to creditors to the extent of his exemptions in distributing his assets. This cardinal purpose dominates the whole law. When the statute deals with the dissolution and annulment of attachments, judgments, etc., it is careful to specify the exception, and the only exception, in which the bankrupt's exempt property shall not be affected by the changed legal status imparted to the rest of his estate by the dissolution of attachments and liens; and that is the case of conveyances made to hinder, delay, and defraud creditors. The subdivision in which this is provided is preceded by one relating to the same general subject, in which no such exception is made; and it is followed by another section, which is peremptory and sweeping in its language, that "all liens shall be deemed null and void, and the property affected shall be wholly discharged and released and shall pass to the trustees as a part of the estate of the bankrupt." If the statute did not intend to except exempt property from the effect of its policy in declaring all liens void, save in the particular instance mentioned, why use such sweeping and peremptory language as necessarily to include all the bankrupt's property in all other sections specifying what shall pass to the trustee? This studied difference in the language of the different subdivisions of the same section, which deals with liens and the effect of their dissolution or annulment, cannot be ignored in ascertaining the legislative intent. It is significant of a purpose not to exclude exempt property, save in the one specified instance, from the benefit of the annulment of liens, and to pass it to the trustee for the benefit of the bankrupt. The main reason for the four-months provision was to prevent the race by creditors to seize the estate of the insolvent when it is found that he is in failing circumstances, and

to prevent the preferences which would follow if liens and attachments were allowed during that period. This purpose would be wholly defeated if liens could be created upon the exempt property. Some creditors would unquestionably be preferred. Some would receive satisfaction in whole, some in part, and some nothing. All this, in the face of the policy of the statute to preserve the exempt property, and to require all creditors who had not acquired liens older than four months, or which are protected, to share equally in the bankrupt's estate.

If subdivision "c" is not destroyed by subdivision "f," it can have no effect in this case, since the debtor resisted the lien, and the creditors did not know he was in contemplation of bankruptcy. Without entering into any extended discussion on the subject, it seems to me that subdivision "f" destroys subdivision "c." If subdivision "f" had been enacted in a subsequent independent statute, there would be little doubt that it was intended as a revision of the entire field of "liens obtained through legal proceedings," and would necessarily amount to a repeal of the prior law on the subject, though there were no express words of repeal. In view of the known history of the enactment of the bankrupt law, and the fact that subdivision "f" is the latest utterance in point of time on the subject of liens obtained by operation of law, I feel compelled to hold that subdivision "f" of section 67 controls this case. Under that section the lien of the attachment "is null and void," and the "property affected" is wholly "discharged and released therefrom," and passes to the trustee "as a part of the estate of the bankrupt." This construction is in harmony with the purpose of other provisions of the bankrupt law to have the whole estate, including the exempt property, pass to the trustee to be administered in the bankrupt court. For certain purposes the court takes possession of the exempt property, and the right of possession passes to the trustee for that purpose. The court is given express power to determine the exemption and to set apart the property to the bankrupt. Although the title to the exempt property does not pass to the trustee, yet, as the purpose of the bankrupt law is to protect it, and to save it to the bankrupt, to the detriment of creditors, the language of the act in section 67, subd. "f," where it speaks of the property affected by the levy passing to the trustee, must be construed to mean that it passes to the trustee for whom it may concern, to be administered in the order that the language and policy of the bankrupt law command. It commands the trustee to set apart some of the property to the bankrupt, whose title is not intended to be affected by its passing into the possession of the trustee, and to devote the rest to the payment of debts. It best comports with the language and policy of the bankrupt law to hold that it annuls "all liens," with the exception stated therein, which are acquired against an insolvent's property by legal proceedings within four months of the filing, and that it intended to destroy such lien upon exempt property as well as upon the other property of the bankrupt.

The questions before me are certified at the instance of Harlan and Sloan, creditors. They proved their claims before the hearing

of the motion to dissolve the injunction, and rely upon facts proved on the hearing to sustain their exceptions. Clearly, Harlan and Sloan were parties to the bankrupt proceedings, and cannot, in any event, complain that the court could not exercise summary jurisdiction over them. Bryan v. Bernheimer, 181 U. S. 188, 21 Sup. Ct. 557, 45 L. Ed. 814. They should have been served with notice of the petition, and had an opportunity to be heard, before the mandatory injunction issued. If, as appears from the petition, there was an exigency, it could have been met by a temporary restraining order, and then injunction could go as the case might require. The exceptions before me relate solely to the propriety of the order itself, and not the manner of its making. These creditors had no claim whatever to the raft of logs, or title or right of possession, save such as might be founded upon the levy of the attachment in their suit against Tune three days before the adjudication. Tune was all the time insolvent. The adjudication "annulled" the levy, and dissolved any lien which otherwise might have been acquired thereunder, and made it the duty of the creditors to refrain from pushing their suits to judgment and insisting that the justice render judgment of condemnation. The adjudication was properly pleaded before the justice before any order of condemnation. These creditors have no right to complain of the appointment of a receiver or of the order to the marshal to put him in possession; for they had no adverse claim to the property in the sense of law, not even a respectable pretense to title or right of possession. So far as they are concerned, the order was right, and they could not complain of it, even if they had not submitted themselves to the jurisdiction of the court. What is the power of the court to deal summarily with strangers?

The decisions, both of the courts of appeal and of the district courts, on this question, are conflicting; and it would unnecessarily incumber this opinion to attempt to review them. The question must be decided in the light of the decisions of the supreme court of the United States; particularly the cases of Bryan v. Bernheimer, 181 U. S. 188, 21 Sup. Ct. 557, 45 L. Ed. 814; Bardes v. Hawarden Bank, 178 U. S. 525, 20 Sup. Ct. 1000, 44 L. Ed. 1175; Hicks v. Knost, 178 U. S. 541, 20 Sup. Ct. 1006, 44 L. Ed. 1183; Mitchell v. McClure, 178 U. S. 539, 20 Sup. Ct. 1000, 44 L. Ed. 1182; and Mueller v. Nugent, 22 Sup. Ct. 269, 46 L. Ed. —— (decided Jan. 20, 1902). It was a matter of doubt among the legal profession whether the decision in Bernheimer's Case did not turn at last upon the fact that Bernheimer submitted himself to the jurisdiction. The supreme court of the United States in Nugent's Case decided that Nugent, the agent of the bankrupt, who had meddled with the property without right before the adjudication, could be subjected to the summary jurisdiction, though he protested against it. Nugent's Case also sheds light upon other questions which had heretofore been in doubt. The district court committed Nugent for contempt for not paying over money which belonged to the bankrupt. The circuit court of appeals (44 C. C. A. 620, 105 Fed. 586) reversed the judgment of the district court. The court of appeals regarded Nugent as a stranger, so far as the jurisdiction of the district court was concerned. It held that,

"even if he were regarded as the agent of the bankrupt, recourse must be had to ordinary legal remedies, and in a proper court." It held, on the authority of the Hawarden Case, that the district court was without jurisdiction to imprison Nugent for disobedience of its orders. The supreme court reversed the decision of the circuit court of appeals, and affirmed that of the district court. The supreme court said "the respondent denied jurisdiction on the ground that he did not receive the money, or any part of it, after the petition in bankruptcy was filed," though "he afterwards sought to amend his response to the rule by asserting that whatever money belonging to the bankrupt came into his hands was not received as agent of, but was held adversely to, the bankrupt." The opinion further says that the "real question involved was whether the order was a lawful order. It was to be determined as a mere question of law on the facts found that the money belonged to the bankrupt's estate, and was then in Nugent's possession as the bankrupt's agent, he asserting no adverse claim."

In another part of the opinion, referring to this, the court said:

"But suppose that respondent had asserted that he had the right to possession by reason of a claim adverse to the bankrupt, the bankruptcy court had the power to ascertain whether any basis for such a claim actually existed at the time of the filing of the petition."

In another place the court asks:

"Does the mere refusal by the bankrupt or his agent so to deliver up oblige the trustee to resort to a plenary suit in a circuit court or a state court, as the case may be? If it be so, the grant of jurisdiction to cause the assets of a bankrupt to be collected and to determine controversies relating thereto would be seriously impaired, and in many respects rendered practically inefficient. The bankruptcy court would be helpless, indeed, if the bare refusal to turn over could conclusively operate to drive the trustee to an action to recover as for an indebtedness, or a conversion, or to proceedings in chancery, at the risk of the accompaniments of delay, complication, and expense, intended to be avoided by the simpler methods of the bankrupt law. It is as true of the present law as it was of that of 1867 that the filing of the petition is a caveat to all the world, and, in effect, an attachment and injunction (Bank v. Sherman, 101 U. S. 407, 25 L. Ed. 866), and on adjudication title to the bankrupt's property became vested in the trustee (section 70, subd. 'c'), with actual or constructive possession, and placed in the custody of the bankrupt court."

In Sherman's Case, quoted approvingly above, the supreme court said:

"The bankrupt became, as it were, for many purposes, civiliter mortuus. * * * Those who dealt with his property in the interval between the filing of the petition and the final adjudication did so at their peril. They could limit neither the power of the court nor the effect of the final exercise of its jurisdiction. * * * Otherwise the efficacy of the act depended not upon its own language and meaning, but was only what others outside of the proceedings might choose to permit it to be."

Certainly, the supreme court of the United States, in its last decision on the subject, did not deem that decision to conflict with the case of Bardes v. Hawarden Bank and the other cases noted, which deny to the court of bankruptcy jurisdiction over suits brought by trustees in bankruptcy to set aside fraudulent transfers of money or property made by the bankrupt to third parties before the insti-

tution of proceedings in bankruptcy. It unquestionably intended that those decisions should stand. But Nugent's Case inevitably withdraws from the influence of Bardes' Case summary, as distinguished from plenary, proceedings against a third person, who without right, or fair appearance of right, retains property of the bankrupt in defiance of the orders of the district court, though he is not a party to the suit, and does not submit to the jurisdiction. It also results irresistibly that it qualifies or departs from any expression to the contrary which may be found in Morgan v. Thornhill, 11 Wall. 65, 20 L. Ed. 60; Smith v. Mason, 14 Wall. 419, 20 L. Ed. 748; Marshall v. Knox, 16 Wall. 551, 21 L. Ed. 481; and Eyster v. Gaff, 91 U. S. 521, 23 L. Ed. 403,—which are all made the subject of review in Bardes' Case, which in turn was under review in Nugent's Case.

In Bardes' Case, 178 U. S. 534, 20 Sup. Ct. 1004, 44 L. Ed. 1175, Mr. Justice Curtis is quoted as saying of two former cases that they are "an illustration of the rule that any opinion given here or elsewhere cannot be relied on as binding authority unless the case calls for its expression." So the Case of Bardes and those following it are not to be construed as holding in any wise that the mere assertion of an adverse claim would oust the summary jurisdiction of a court of bankruptcy to ascertain (to use the language in Nugent's Case) "whether any basis for such actually existed at the time of the filing of the petition," or the further holding in Nugent's Case that the court "would be bound to enter upon that inquiry." It is apparent from reading the opinion in Nugent's Case that the only adverse claim which could oust the summary jurisdiction was a claim which was not merely colorable. To use its language again, there must be an "actual basis" for the claim. This is only the application of the familiar principle regarding equity jurisdiction in cases where it is essential to injunctive relief to have a superior legal title or right to the defendant. A bare claim, a bare denial of the plaintiff's right, no matter how positive, will not dissolve the injunction; but the defendant must go further and show facts in support of the denial, which at least give color of right in him, and make the contested matter of right between him and the complainant one of some fair doubt. There must be reasonable room for controversy.

Now, then, when the trustee of the bankrupt claims property to which another sets up title, and asks the assistance of the court of bankruptcy, the court, to use the language of Nugent's Case, "is bound to enter upon that inquiry." If, as the supreme court says, "it is bound to enter upon that inquiry," and "in doing so undoubtedly acted within its jurisdiction," is not the court, if it finds the claim merely colorable, bound to direct the surrender of the property to the trustee? Clearly, the court is "bound to enter upon the inquiry," and, if the facts in the particular case show that the detention is without color of right, then it is bound to take and administer the property. It is safe to say that a claim like that here is without color of right when upon the undisputed facts, as matter of law repeatedly construed by the highest court in the United States, the claim is baseless. Subdivision "f," § 67, of the bankruptcy law, declares that "all levies, judgments, attachments or other liens obtained by legal pro-

ceedings against a person who is insolvent, at any time within four months prior to the filing of the petition in bankruptcy against him, shall be deemed null and void in case he is adjudged a bankrupt; and the property affected by the levy, judgment, attachment, or other lien shall be deemed wholly discharged and released from the same, and shall pass to the trustees as a part of the estate of the bankrupt." This provision applies alike to voluntary and involuntary petitions. Of the constitutionality of this statute there can be no doubt, for it is passed in pursuance of a grant in the constitution, which authorizes congress to confer upon the courts of the United States exclusive jurisdiction of matters in bankruptcy. If this section is constitutional, there would seem to be no doubt that the state court, in which such an attachment was begun, lost all right to the custody of the property; for by operation of the supreme law the custody was devested out of that court, and invested in the trustee. The cable which kept the property in the grasp of the jurisdiction of the state court parted when the law annulled the levy. The levy could no longer affect the property. The adjudication vacated it. Subdivision "f" quashed it, and the property "affected" by it was "wholly released and discharged" from its power. How is it possible in such a case for a court to have jurisdiction and rightful possession over the rem, when against the only proceeding which could confer a right to possession the law itself pronounces an inexorable sentence of nullity, and at the same time stripped the court of jurisdiction to make any further order? The jurisdiction of the court of bankruptcy to enforce the possession that the law gives it, and to take the property from the other court, which, in the contingency named, has no jurisdiction over or right to possession of the rem, seems plain. If this court has the jurisdiction, and application is properly made to it, it cannot refuse to exercise it. Why, then, should it not take the property on which the attachment is had into its own custody?

In weighing the effect of the adjudication upon the attaching court's possession by reason of annullment of levy, we must not confound title and right of possession. The legal title is often in one man and the right of possession in another. It is true the bankrupt's title passes to the trustee "as of the date of the adjudication," but where forbidden liens, which the law annuls, are concerned, the adjudication determines the right of possession, not only "as of the date of the adjudication," but within four months prior to the filing of the petition. In the eye of the law no right of possession can result from the void levy; and the possession, as well as the right of possession, thus acquired, are, by force of the statute and adjudication, put either in the bankrupt or trustee; for the attaching creditor can take nothing by his void levy. If the possession and right of possession at the time of the void levy remain by force of the statute in the bankrupt, the trustee, who takes subject only to valid liens, has a right of possession which relates back to the void levy, since he succeeds to the rights of the bankrupt. So, the void levy, the only process by which the attaching court can claim possession, is converted by the adjudication into a levy upon the possession of the trustee, which, as against forbidden liens, was prohibited by law the very moment the lien

was thus attempted to be created. Concede the possession acquired by the annulled levy to have been rightful up to the time of the adjudication, yet after that the right of possession based upon the levy was absolutely destroyed, and became void ab initio. It is to be noted that the language of the statute is not merely that the lien shall be "null and void," and the property shall be "wholly released," but that they "shall be deemed" null and void, and the property "shall be deemed" wholly discharged. This expression is twice used. Deemed by whom? Certainly, by all courts. Why? Unquestionably to compel those intrusted with the administration of the law to treat the annulled liens as though they had never existed, and the property as though it had never been taken in possession. The purpose is plain that the court of bankruptcy must act upon the matter as though the attaching court had never made a levy, and the property had never come in its possession, or passed out of the control of the bankrupt. Such a levy cannot retain or nourish any right of possession in the attaching court after the adjudication, and it is the only claim on which a remaining right of possession in the state court is rested. It is void ab initio. As long as the levy was made within four months of the filing of the petition, the date when the bankrupt's title passed to the trustee is immaterial to any issue here presented.

It is said that comity prevents one court from interfering with property in the possession of another court. This is a wise and salutary rule repeatedly enforced by the supreme court of the United States, and respected by all lovers of law and order. No one bows to the rule more profoundly than the writer of this opinion. But the question is not one of comity or concurrent jurisdiction. It is a question of the supremacy of the constitution and laws of the United States, to which state and federal courts alike must bow. It is no new thing in our jurisprudence for a state court, which had concurrent jurisdiction of the subject-matter with the federal court, and first obtained jurisdiction, to lose that jurisdiction, and have that jurisdiction by operation of "the supreme law of the land" vested exclusively in a federal court, which enforces the transfer of the res into its own custody. Our removal laws are familiar instances of this loss of jurisdiction by one court after that court has acquired such jurisdiction, and the gain of its jurisdiction by another court. The sections of the act cited inevitably give the district courts of the United States the exclusive jurisdiction to administer the estate of an insolvent, as against liens and attachments acquired against insolvents by legal proceedings, at any time within four months prior to the filing of the petition, with exceptions named not here material, if he be adjudged bankrupt; for, in the language of the statute, "the property affected by the levy, judgment, attachment, or other lien shall be deemed wholly discharged and released from the same," and "shall pass" to the trustee as a part of the estate of the bankrupt. As to suits to obtain liens upon an insolvent's property, brought before adjudication, but within four months of the filing, the only jurisdiction which can remain in the attaching court is to hold on to the suit; and if discharge is not granted, or granted and not pleaded, to render a judgment in personam. Its jurisdiction over the rem is taken away by the adjudica-

tion. The failure to obtain a discharge cannot revest the state court with jurisdiction of the rem, which remains in the court of bankruptcy to administer, unaffected by the denial of a discharge to the bankrupt.

When the attaching court, after the adjudication is formally brought to its notice by a party to the record by timely plea, ruthlessly disregards it, and proceeds, in violation of the law of the land, to enter judgment of condemnation, what comity does it extend to the court of bankruptcy? There is no reason to suspect that it would pay any attention to a request to surrender possession, and no reason in such a case why the request should precede the order. On the happening of the contingencies mentioned in subdivision "f," the jurisdiction of the state court is taken from it as completely as when there has been a removal from state to federal courts by a party "entitled to removal." In such a case it has many times been held that the jurisdiction of the state court "absolutely ceased, and that of the circuit court of the United States immediately attached"; that the state court was "without further jurisdiction"; its rightful jurisdiction comes to an end. Crehore v. Railway Co., 131 U. S. 243, 9 Sup. Ct. 692, 33 L. Ed. 144. The jurisdiction of the state court over the attached property in this case, whatever it might have been, has ceased and determined. The levy is void. The court's orders with reference to the possession of the property are void. The original levy being void, the court, having no further jurisdiction, cannot make any further order except to stay the suit. It cannot protect the officer or party acting or claiming under such orders if made. He becomes a trespasser as to the property without a shadow of legal claim to the property or to its possession whenever he refuses to deliver on demand of the rightful owner, the trustee, or the receiver. It seems, therefore, to follow conclusively from the principles stated that the court of bankruptcy in the cases of attachments mentioned in subdivision "f," not only has the jurisdiction, but is under duty, to take the property from the possession of one who, though originally holding for the state court, has, by reason of its loss of jurisdiction over the rem, become a mere bailee for the true owner, whenever, on proper demand, such bailee refuses to surrender possession. It is entirely illogical to contend in such a case that the court of bankruptcy interferes, in any legal sense, with the possession of the state court.

The collection and distribution of the assets of the bankrupt estate in a sense involves the administration of a trust. The court to which the administration is confided has the inherent power, apart from the special jurisdiction conferred by the bankrupt law, if need be, on its own motion, to punish mere intermeddlers by summary process. It can make no difference that the jurisdiction is invoked by the trustee, the receiver, or the bankrupt himself, so long as the person against whom the power of the court is invoked is a mere intermeddler, or one who claims to hold or take possession under a claim which in law is purely colorable. Such proceedings are not "suits" in the ordinary meaning of the term, nor in the sense in which the word is used in subdivision "b" of section 23. They come, rather,

under subdivision 15 of section 2, which empowers the court "to make such orders, issue such process, and enter such judgments, in addition to those specifically provided for, as may be necessary for the enforcement of the provisions of this act." Each case of this kind, of course, must depend upon its own facts. If it be clear that the property belonged to the bankrupt, that it was attached in proceedings against an insolvent within four months of the filing of the petition, and that the only claim of the person in actual possession of the property is derived from these proceedings, the case is clearly within the principles enunciated in Nugent's Case. On the other hand, if, in the particular case, there is any fair room for doubt as to the fact of insolvency when the evidence is presented,—and that is the only issue which can arise, since the intent with which the attachment is levied is entirely immaterial,—the claim is not "merely colorable," and the summary jurisdiction cannot be further pursued. In Re Seebold, 45 C. C. A. 117, 105 Fed. 910, the circuit court of appeals in this circuit held, where an action was begun in a state court, prosecuted to judgment, and execution issued, and the property subjected to the pledge by judgment, seized, and advertised for sale before the institution of proceedings in voluntary bankruptcy, the state court having possession of the property and the jurisdiction of the parties, the court of bankruptcy had no authority to stay the proceedings. Most clearly that decision was right. The action asked at the hands of the court of bankruptcy in that case was an attempt to annul a lien preserved by the bankrupt law, a lien of which the supreme court of the United States had said in another case, "The lessor's lien on the goods of the tenant on the premises is one of the strongest and most favored under the law of Louisiana." In Re Kenney, 45 C. C. A. 113, 105 Fed. 897, the circuit court of appeals of the Second circuit held that where, within four months before the filing of the petition in bankruptcy against an insolvent judgment debtor, execution had been issued and levied upon his personal property, and a sale made, the proceeds of such sale remaining in the sheriff's hands at the time of the adjudication did not belong to the judgment creditor, but to the estate of the bankrupt, and the court of bankruptcy has power and jurisdiction to order the sheriff to pay over such proceeds to the trustee when appointed. In Re Seebold, supra, there are many general expressions contrary to the conclusion I have reached, but they were not necessary to the decision of the case. This case and that differ in vital respects. One concerns a lien which the bankrupt law preserves, and the other a lien which it destroys. In the one there was a judgment ascertaining the debt and decreeing satisfaction out of a pledge before the petition was filed. In this case there was no pledge, and the adjudication annuls the lien begun by levy of an attachment, and it cannot now be followed by judgment of condemnation of the rem in the state court. How far our court of appeals would feel bound by the general expressions in that case it is not for me to determine; nor can I foresee whether the general expressions used in that case on the facts of this case would not be modified by the principles declared in Nugent's Case. If In re Seebold were "on all fours" with this case, my sense of subordination and

of the respect due a higher tribunal would make me accept the general views there declared as conclusive, though other courts of like high grade might have decided otherwise. When, however, the supreme court has made later utterances on the subject, and the facts of this case differ so materially from the facts of Seebold's Case, there can be no impropriety in following my own judgment.

The aptness of the remark quoted from Nugent's Case that the bankruptcy court "would be helpless, indeed, if the bare refusal to turn over could conclusively operate to drive trustees to an action to recover," etc., is strikingly illustrated by the facts of this case. Tune was adjudicated a bankrupt three days after the levy. He promptly appeared and pleaded the adjudication before the judgment of condemnation. The justice, after a little delay, proceeded to render judgment of condemnation notwithstanding the adjudication, and the constable, indemnified by creditors who were unwilling to stay judgment in their suit, in obedience to the bankrupt law, was about to sell the property. It was exempt under the laws of the state until a valid condemnation was had. The attachment—the court's only title to possession—had been annulled, and the supreme law required that the property be delivered to the trustee. But for the interposition of this court, the raft of logs, which was practically the only disposable property of the bankrupt, would have been sold, and the owner driven to a lawsuit with the plaintiff, or a suit on the constable's bond,— neither of which might have been fruitful,—to get the proceeds of a sale of the exempt property, which it was the duty of the bankrupt court to set apart to him, and which could have been determined there with little cost and delay. If such proceedings cannot be prevented by the court of bankruptcy, it would soon become a mere auditor of the debts of the bankrupt, and go through the formal ceremony of discharging him, while other courts would administer and distribute the property and determine the rights of the creditors therein.

The creditors can take nothing from their exception to the order of the referee, which is in all things confirmed.