[No. 990.]

## EX PARTE PHILIPP DEIDESHEIMER.

RIGHTS OF STOCKHOLDERS—DUTY OF SUPERINTENDENT—STATUTE CONSTRUED.—In construing the provisions of the act to protect the rights of stockholders in the mines of this state (Stat. 1877, 80; Stat. 1879, 57): *Held,* that the superintendent can not be held guilty of a misdemeanor for refusing to permit the qualified stockholders to examine the mine.

IDEM—PENAL STATUTE.—Penal laws should be plainly written, so that every one may know with certainty what acts or omissions constitute the crime

HABEAS CORPUS. The facts appear in the opinion.

*B. C. Whitman and C. J. Hillyer,* for Petitioner.

*Stone & Hiles, Seeley & Woodburn, and M. A. Murphy,* Attorney-General for the State.

By the Court, LEONARD, J.:

The petitioner, Philipp Deidesheimer, is brought before me in chambers on *habeas corpus,* with a return showing he was arrested and is detained under a warrant of arrest issued by Thomas Moses, justice of the peace of Township No. 1, in Storey county, by James Jewell, constable of said township. There is no dispute as to the facts, which are as follows:

On the twenty-eighth day of July, 1879, the petitioner was the duly qualified and acting superintendent of the Hale and Norcross Mining Company, a foreign corporation incorporated for the purpose of working upon and mining in the Comstock lode, in Storey county, and on that day A. B. Thompson, who, as owner and agent, was possessed of one fifth of one per cent. of the original capital stock of

said corporation, applied to said justice, under and in accordance with the provisions of section 1 of the statute hereafter noticed, found on page 57, statutes of 1879, for an order to examine the shafts, adits and hoisting works of the mine of said corporation. Thereupon the justice delivered to Thompson an order directed to petitioner as superintendent, commanding him "to admit Thompson into said mine and permit him to examine fully all parts of the shafts, adits, borings, drifts, stopes, winzes, hoisting apparatus and every and all properties and appurtenances belonging to said mining company." Thereafter, on said day, Thompson presented the order to petitioner at the mine of the company, and demanded to be admitted. Petitioner then and there refused to comply with the order, or any part thereof. At the time of the application and refusal just mentioned, there was posted in a conspicuous place at the mine, a notice, of which the following is a copy:

"Virginia, Nevada—Notice! In compliance with the provisions of the act of the legislature of the state of Nevada, touching the examination of mines, etc., Monday is named as the day of the week in which authorized stockholders may be admitted under the provisions of said act.
                                        "Philipp Deidesheimer, Sup't."

It is admitted that petitioner complied with the law in relation to posting notice.

A complaint upon oath was thereupon laid before the justice, charging petitioner with the crime of refusing him, the said Thompson, admittance to the underground works and mine of the Hale and Norcross Mining Company, upon the Comstock lode, in Storey county, Nevada, contrary to the provisions of an act of the legislature of the state of Nevada, entitled "An act to amend an act, entitled 'An act to protect the rights of owners of stock shares and other interests in the mineral and metal-yielding mines of this state.' Approved February 21, 1877." A warrant of arrest was issued and placed in the hands of the constable, who arrested petitioner, and he is now detained under said writ. The warrant is conceded to

be in due form; but it is alleged in the petition, and claimed by counsel for petitioner, that such warrant was and is without authority of law.

It is said by counsel for the state, that if petitioner is discharged, the order therefor must be based upon some one or more of the grounds set out in section 20 of the habeas corpus act (Stat. 1862, p. 100); that he must bring his case within either or both of subdivisions fourth and sixth of such section, which provide that the petitioner may be discharged. * * * "Fourth—When the process, though proper in form, has been issued in a case not allowed by law." * * * "Sixth—Where the process is not authorized by any judgment, order or decree of any court, nor by any provision of law."

As I view the case, it may be decided by asking and answering the question submitted by counsel for the state as the main one in controversy, to wit: "Was this warrant issued in a case allowed by law, or is the process authorized by any provision of law?"

The original statute, entitled "An act to protect the rights of owners of stock shares and other interests in the mineral and metal-yielding mines of this state," was passed and approved in 1877. (Stat. 1877, p. 80.)

In 1879, section 1 of the statute just referred to was amended, but section 5 was not amended or re-enacted.

It is urged by counsel for petitioner, that section 5 of the statute of 1877 only attaches to a violation of the provisions or conditions of section 1 of that act, and that it does not attach or apply to a violation of the provisions or conditions of section 1, as amended in 1879. In my opinion section 1 as amended, and section 5 in the original act, must be construed together, as though the former had been incorporated in the prior act at the time of its adoption. (*Holbrook* v. *Nicholl*, 36 Ill. 161; *McKibben* v. *Lester*, 9 Ohio St. 627; Sedgwick on the Construction Stat. Law, 68.)

For the purposes of this case, section 1 of the statute of 1879, and section 5 of the statute of 1877, may be epitomized as follows:

"Section 1. Any person being the *bona fide* owner of one

fifth of one per cent. of the original capital stock of any company incorporated for the purpose of working upon and mining in any lode   \*   \*   \*   of precious or useful metals in this state, and any number of persons being the *bona fide* owners, in the aggregate, of such amount of stock, at the time application for a permit to examine any such mine shall be made, such owner or owners, upon a written order from the county clerk or justice of the peace,   \*   \*   \* shall be entitled to the privilege of fully examining all of the shafts, adits, borings, drifts, stopes, hoisting apparatus, and every and all properties and appurtenances belonging to such mining company; *provided,* that not more than one owner of said percentage or aggregate percentages of such mining stock shall, either in person or by agent, be entitled to such order   \*   \*   \*   oftener than twice in one month; these days shall not be *more than fourteen nor less than fifteen days apart. It shall be the duty of the superintendent or other person or parties in charge of any incorporated mining claim*   \*   \*   \*   *to keep posted in some conspicuous place at or near the mine, the day of the week in which authorized stockholders may be admitted under the provisions of this act.*"

"Sec. 5. Any mining superintendent, or mining foreman, or mining secretary, of any incorporated mining company in this state, acting under and for such mining company, *who shall fail or refuse to comply with any of the conditions mentioned in section 1 of this act, shall, for each and every such failure or refusal, be deemed guilty of a misdemeanor,*" etc.

It is claimed on the part of petitioner that the only condition or duty imposed upon him is that he shall post the notice, and that, inasmuch as he did that, he is guilty of no crime under the statute, either by neglect or refusal; that, in addition, the first section is only a declaration of the rights of certain stockholders, and that if those rights are infringed the remedy is against the company and not the superintendent. In a word, it is claimed that the superintendent has not violated any of the conditions or provisions of section 1. On the other hand it is urged by counsel for the state, that the "conditions" referred to in the fifth section are the performance of two obligations or duties

by the superintendent, viz: First, to post the notice, which is required in express terms; and, second, to admit the stockholders, which is required by necessary implication.

The last part of section 1, in relation to posting the notice, may be disregarded; because, if that is the "condition" intended in section 5, it is admitted that petitioner has fully complied therewith. I have nothing to do with the policy of the law under examination. My duty is limited to a consideration of the question whether or not the petitioner is unlawfully restrained of his liberty, under and by virtue of the warrant of arrest above mentioned; and the solution of this question for or against him depends entirely upon the conclusion arrived at in answer to the further inquiry: Was his refusal to admit Thompson a violation of any of the conditions or provisions of section 1? In other words, is it a provision or condition of section 1 that the superintendent in charge shall admit the qualified stockholders?

As before stated, it is admitted by counsel for the state, that if the admission of qualified stockholders by the superintendent is one of the "conditions" referred to in section 5, it becomes so by necessary implication rather than by express words. And if such admission is a plain duty which the superintendent can not fail or refuse to perform without being guilty of a misdemeanor, it becomes so only by reason of the declaration that "such owner or owners * * * shall be entitled to the privilege of fully examining all the shafts * * * and every and all properties and appurtenances belonging to any such mining company."

The statute makes the posting of notice the superintendent's plain duty; but he is not commanded to admit stockholders, nor is he in terms forbidden to refuse admission. Penal laws generally prescribe what shall or shall not be done, and then declare the consequences of a violation of either requirement.

They should be plainly written, so that every person may know with certainty what acts or omissions constitute the

Crime. (Bish. on Stat. Crimes, sec. 193; Beccaria on crimes, 22, 45; *The Schooner Enterprise,* 1 Paine, 33.

Beccaria says: "I do not know of any exception to this general axiom, that every member of the society should know when he is a criminal and when innocent." (45.)

"There is nothing more dangerous than the common axiom, the spirit of the laws is to be considered. To adopt it is to give way to the torrent of opinions. This may seem a paradox to vulgar minds, which are more strongly affected by the smallest disorder before their eyes, than by the most pernicious, though remote, consequences produced by one false principle adopted by a nation. Our knowledge is in proportion to the number of our ideas. The more complex these are, the greater is the variety of positions in which they may be considered. Every man hath his own particular point of view, and at different times sees the same objects in very different lights. The spirit of the laws will then be the result of the good or bad logic of the judge; and this will depend on his good or bad digestion; on the violence of his passions; on the rank and condition of the accused; or on his connection with the judge; and on all those circumstances which change the appearance of objects in the fluctuating mind of man. Hence we see the fate of a delinquent changed many times in passing through the different courts of judicature, and his life and liberty victims to the false ideas or ill humor of the judge, who mistakes the vague result of his own confused reasoning for the just interpretation of the laws. We see the same crimes punished in a different manner at different times in the same tribunals; the consequence of not having consulted the constant and invariable voice of the laws, but the erring instability of arbitrary interpretation." (22.)

In the case of the schooner Enterprise, Mr. Justice Livingston used the following language: "The act, and particularly that part of it under which a forfeiture is claimed, is highly penal, and must therefore be construed as such laws always have been and ever should be. But while it is said that penal statutes are to receive a strict

construction, nothing more is meant than that they shall not, by what may be thought their spirit of equity, be extended to offenses other than those which are specially and clearly described and provided for. A court is not, therefore, as the appellant supposes, precluded from inquiring into the intention of the legislature. However clearly a law be expressed, this must ever, more or less, be a matter of inquiry. A court is not, however, permitted to arrive at this intention by mere conjecture, but it is to collect it from the object which the legislature had in view and the expressions used, which should be competent and proper to apprise the community at large of the rule which it is intended to prescribe for their government." * * * "If it be the duty of a jury to acquit where such doubts exist concerning a fact, it is equally incumbent on a judge not to apply the law to a case where he labors under the same uncertainty as to the meaning of the legislature." * * * "The attention of the court has been called to a history of the progress of the several laws relating to the embargo, and to the mischiefs which were unprovided for, at the time of the passage of the one under consideration, in order to show what was intended by the legislature. Almost every possible evasion, it is said, had been previously guarded against by adequate sanctions, except that of loading clandestinely or by night, and then watching an opportunity of going to sea without a clearance or giving bonds, which was the evil to which it was intended to apply a remedy. Be it so. This may have been in the contemplation of congress, but we are not bound to conclude that they have done what was intended, unless fit words be used for the purpose."

And in the *United States* v. *Wiltberger* (opinion by Chief Justice Marshall) the court says: "It has been said that although penal laws are to be construed strictly, the intention of the legislature must govern in their construction. That if a case be within the intention, it must be considered within the letter of the statute. So if it be within the reason of the statute. The rule that penal laws are to be construed strictly is perhaps not much less old than construction

itself. It is founded on the tenderness of the law for the rights of individuals; and on the plain principle that the power of punishment is vested in the legislative, not in the judicial department. It is the legislature, not the court, which is to define a crime and ordain its punishment. * * The intention of the legislature is to be collected from the words they employ. Where there is no ambiguity in the words, there is no room for construction. The case must be a strong one indeed which would justify a court in departing from the plain meaning of the words, especially in a penal act, in search of an intention which the words themselves do not suggest. To determine that a case is within the intention of a statute, its language must authorize us to say so." (See, also, Sedgwick on the Construction of Stat. and Const. Law, 279, *et seq.;* Smith's Commentaries, sec. 746; Bish. on Stat. Crimes, sec. 192, *et seq.*)

In *Jones* v. *Smart*, 1 T. R. 52, Butler, justice, says: "We are bound to take an act of parliament as they have made it; a *casus omissus* can in no case be supplied by a court of law, for that would be to make laws."

Mr. Dwarris says: "The result is, that to bring a case within the statute, it should be, not only within the mischief contemplated by the legislature, but also within the plain, intelligible import of the words of the act of parliament." (Dwarris on Statutes, 711.)

That such should be, and is, the fundamental rule in relation to penal statutes admits of no doubt. Nor are the cases cited by counsel for the state in any manner opposed to the rules stated above. (See *United States* v. *Winn*, 3 Sumner, 209; *The Emily and The Caroline*, 9 Wheat. 381.)

There can be no better example of the great danger of resorting to implications in order to find that a crime has been committed than the argument of counsel for the state in this case. They say: "There are many acts, in connection with the visit of the stockholders to the mine, which the statute only impliedly makes it the duty of the superintendent to perform. As for example: To furnish the stockholder with the machinery and appliances usually had and used in and about the mine for ascending and descend-

ing the shaft, *and, if necessary, to furnish him with a proper guide to assist him in examining the shafts, adits, borings, drifts, slopes, hoisting apparatus, and every and all properties and appurtenances belonging to such mining company; and if he should fail or refuse to perform such acts, he would be violating the statute, although the doing of such acts is not enjoined upon him by the express terms of the act.*"

I do not intend to intimate whether it would be the superintendent's duty to furnish any or all the means of examination suggested by counsel, if it be true that in a criminal case implied duties may be multiplied, as counsel claim. This argument is referred to, only to show the danger of finding a statutory crime where the words do not plainly authorize it. If counsel are correct, what superintendent could ever know when he is within or without the statute? One stockholder might demand one thing and another something else. If the superintendent must furnish a guide, although nothing is said about it in the law, why should he not, with equal propriety, be required to furnish rubber coats and boots, if the mine is wet, and such articles are used in the mine?

If he cannot go to the law and there find what is required of him, or what he is prohibited from doing, his only safe course would be to comply with every request made; for should he fail or refuse to comply, if counsel are correct, it might be decided that he refused to perform an implied duty, which is one of the conditions of section 1. Suppose we had this statute in substance:

Section 1. Every county assessor, before making an assessment, shall be entitled to the privilege of examining the books of all firms, corporations and individuals selling merchandise within his county.

Sec. 2. Any person having charge of such business, whether principal, agent or superintendent, who shall fail or refuse to comply with the conditions of section 1, shall be deemed guilty of a misdemeanor and be punished, etc.

Under that statute, the assessor goes to a Chinese corporation selling merchandise, and demands of the person in charge the privilege of examining the books. They are

produced, but are kept in the Chinese language. The assessor, being unable to understand the Chinese method of bookkeeping, demands an interpreter, upon the ground that it is an implied duty on the part of the corporation to furnish one.

Even admitting that implied duties or prohibitions, within reasonable limits, may be considered in relation to penal statutes, in my opinion it is not such duty to furnish a guide in the one place or an interpreter in the other. But other judges might think otherwise, and thus we see some of the evils liable to arise from an equitable, rather than a strict, construction of penal statutes—some of the evils so vividly portrayed by Beccaria—thus we see that superintendents would be in continual doubt as to their duties, and, consequently, would not know with certainty when they could with impunity refuse a stockholder's request. The legislature may have intended to require of the superintendent all that is claimed by counsel for the state; but if such was the intention, they failed to use any fit words expressing the same. In their absence I am unable to arrive at the conclusion that the petitioner committed any offense in refusing to admit the complainant to the Hale & Norcross mine and works. It follows that he is detained without authority of law and must be discharged. I am permitted to add, that in the above construction of the statutes referred to, my associates fully concur. The petitioner is discharged.