[No. 1913]

# EX PARTE SMITH

1. STATUTES—CONSTRUCTION—INTENTION OF LEGISLATURE.
   In the construction of statutes, the intention of the legislature controls the courts, and should be ascertained and followed.

2. STATUTES—CONSTRUCTION—EFFECT TO WHOLE STATUTE.
   Statutes should be construed so that, as far as possible, effect may be given to all the language of an act.

3. STATUTES—CONSTRUCTION—GENERAL AND SPECIAL PROVISIONS.
   In the construction of statutes, a special provision will control as against a general one.

4. BANKS AND BANKING — OFFICERS — OFFENSES — "ASSENT" TO DEPOSITS WHEN BANK INSOLVENT.
   An indictment charging the accused with assenting to the receipt of bank deposits was framed under the act of March 13, 1909 (Stats. 1909, c. 92), which by section 1 makes it a crime for a bank officer to receive deposits or to assent to the receipt of deposits when the bank is known to be insolvent, and by section 2 provides that any officer of an incorporated bank, having authority to close the bank or to prevent the receipt of deposits, who shall not exercise such authority when he knows that the bank is insolvent, shall be deemed to have assented to the receipt of deposits. The indictment contained no allegations that the accused had any authority to close the bank, or to prevent the receipt of deposits, or that the accused personally received deposits knowing the bank to be insolvent. *Held,* that, under section 2, considered with the direct definition of section 1 as to the offense of assenting to the receipt of deposits, the "assent" required by the statute implied permission, and presupposed some inherent power to withhold assent.

5. BANKS AND BANKING—OFFICERS—STATUTORY OFFENSES—ASSENT TO DEPOSIT WHEN BANK INSOLVENT—EVIDENCE.
   Under an indictment for assenting to the receipt of deposits by an officer of an incorporated bank, contrary to act of March 13, 1909 (Stats. 1909, c. 92), which by section 1 makes it a crime for any bank officer to receive or to assent to the receipt of deposits knowing the bank to be insolvent, and by section 2 provides that any bank officer having authority to close the bank or to prevent the receipt of deposits, who does not exercise such authority when the bank is known to be insolvent, shall be deemed to have assented to the receipt of deposits, and making the failure of such bank within thirty days after the receipt of any deposits *prima facie* evidence of such officer's knowledge of its insolvency, the presumption of knowledge of insolvency by its terms applies only to such officers as have power to close the bank or to prevent deposits.

6. STATUTES—CONSTRUCTION—CONFLICTING PROVISIONS.
   When two provisions of a statute are not reconcilable, the last one controls, as being the latest expression of the legislative will.

7. BANKS AND BANKING—STATUTORY OFFENSES—WHAT OFFICERS GUILTY.

Under the act of March 13, 1909 (Stats. 1909, c. 92), only such officers as were present at the receipt of deposits, or who actually received the deposits, or who had authority to close the bank or to prevent the receipt of deposits, could be guilty of the offense of assenting to the receipt of deposits.

8. BANKS AND BANKING—POWER OF PRESIDENT.

Unless specially authorized by the board of directors, the president or a director of a bank is not legally authorized to close the bank or to prevent the receipt of deposits by the bank.

9. STATUTES—CONSTRUCTION—CLASSES OF STATUTES—PENAL STATUTES.

Penal statutes must be liberally construed in favor of the accused, and it must appear that he committed acts which are clearly made an offense by the statute.

10. BANKS AND BANKING — STATUTES — CONSTRUCTION — RECEIVING DEPOSITS WHEN INSOLVENT—"DEEMED."

The title of the act of March 13, 1909 (Stats. 1909, c. 92), in addition to referring to the offenses declared, states that its purpose is to establish a rule of evidence in connection therewith. Section 2 makes the failure of a bank within thirty days after the receipt of deposits *prima facie* evidence of the officers' knowledge of its insolvency, and in a previous part it is provided that any officer having authority to close the bank or to prevent the receipt of deposits, who does not exercise such authority, shall be "deemed" to have assented to the receipt of deposits. *Held*, that only the part of the section relating to the knowledge imputed from the bank's failure is evidential in character, while the word "deemed," as used in the section, means "adjudged," in the sense of constituting a crime, instead of a rule of evidence.

11. CRIMINAL LAW — ACCESSORY BEFORE THE FACT — STATUTES — OFFENSE.

The act relating to crimes and punishments (Stats. 1861, c. 28), section 10 of which defines an accessory before the fact and makes him a principal, does not apply as against an accessory before the fact under an indictment which does not allege facts sufficient to constitute an offense by the principal.

12. BANKS AND BANKING—OFFICERS—STATUTORY OFFENSES.

There is nothing in the act of March 13, 1909 (Stats. 1909, c. 92), which by section 1 penalizes the receipt or the assent to the receipt of deposits by a bank officer, who knows the bank to be insolvent, and by section 2 provides that a bank officer having authority to close the bank or to prevent the receipt of deposits, and failing to exercise such authority, is deemed guilty of assenting to the receipt of deposits, which makes an officer of an incorporated bank criminally liable simply because he is such officer with knowledge of the bank's insolvency, or because deposits are being received for the bank by some other officer.

13. CRIMINAL LAW—DISCHARGE OF ACCUSED ON HABEAS CORPUS—
    INSUFFICIENCY OF INDICTMENT—EFFECT—NEW INDICTMENT.
    Where the court in *habeas corpus* reviews an indictment
    framed under the act of March 13, 1909 (Stats. 1909, c. 92),
    and holds it to allege no offense, a discharge of the petitioner
    will not prevent a new indictment upon evidence bringing the
    case within the statute.

ORIGINAL PROCEEDING. Application by Oscar J. Smith
for a writ of *habeas corpus* for release from commitment
under an indictment. **Petitioner discharged from the
indictment.**

The facts sufficiently appear in the opinion.

*S. S. Downer* and *Boyd & Salisbury* (*Oscar J. Smith, in
pro. per.*) for Petitioner:

The intention of the legislature controls the courts.
(*Maynard* v. *Newman*, 1 Nev. 271; *Maynard* v. *Johnson*,
2 Nev. 25; *Brown* v. *Davis*, 1 Nev. 409.)

Effect shall be given to all the language of the statute
of March 13, 1909. (Stats. 1908–09, 95; 26 Am. & Eng.
Ency. Law, 616, and cases cited; *Leet* v. *John Dare S. M.
Co.*, 6. Nev. 218, 222.)

Penal statutes must be construed liberally in favor of
an individual. (*State* v. *Wheeler*, 23 Nev. 152; *In re Davis*,
33 Nev. 309.)

Special provision of statute will control against a gen-
eral provision. (26 Am. & Eng. Ency. Law, 618, 619, and
cases cited.)

When two provisions of a statute are irreconcilable, the
last in order of position must control. (26 Am. & Eng.
Ency. Law, 619, 620; *Ex Parte Hewlett*, 22 Nev. 333.)

The language of section 2 limits, defines and controls
the language of section 1, so that only officers having
authority to close a bank or to prevent the reception of
deposits therein are criminally liable for assenting to the
reception of deposits in an insolvent bank. (26 Am. &
Eng. Ency. Law, 616, 619, 620; *Leet* v. *John Dare S. M.
Co.*, 6 Nev. 218, 222; *State* v. *Wheeler*, 23 Nev. 152; *In re
Davis*, 33 Nev. 309; Stats. 1908–09, 95, 251, 254, 263, 265–267.)

It is essential that the indictment set forth the author-

ity of the officer to close the bank or to prevent the reception of deposits therein. . (10 Ency. Pl. & Pr. 474; *State* v. *Chapman*, 6 Nev. 320, 333; 10 Ency. Pl. & Pr. 486, 487, 488; *Com.* v. *Barrett*, 108 Mass. 303.)

Statutes *in pari materia* shall be construed with reference to each other. (10 Ency. Pl. & Pr. 485; *Com.* v. *Barrett*, 108 Mass. 303; *State* v. *Hoover*, 5 Nev. 141; *State* v. *Rogers*, 10 Nev. 319; *State* v. *Donnelly*, 20 Nev. 214.)

That the penal statutes of March 13, 1909, and the banking act of March 24, 1909, are *in pari materia*, in so far as each treats of and refers to insolvent banks.

That the state bank examiner and the state banking board are public officers. That the state is bound by the acts of its officers within the scope of their authority. That the examiner and banking board had full power and authority to make inquisitorial examinations of the bank, to determine its solvency or insolvency, and to compel the closing of its doors. That the officers of the bank had a right to rely upon the acts of the said public officers, and, in the absence of fraud, collusion or wilful withholding of information, are not liable to indictment as the result of having so relied, and the state is estopped.

That no criminal liability could attach to the officers of the bank until after an adjudication of insolvency had been made by the banking board, and the examiner, or some other person, duly ordered to take charge of the bank pending application for receiver, and then only after such action by the board had been disregarded by the bank and further deposits received.

That the examiner and banking board must be presumed to have done their duty (in the absence of allegations of fraud, etc.), and the bank must be conclusively presumed to have been solvent prior to the date when action was actually taken by said board.

The indictment must contain all material allegations showing what action was taken by these public officers; that the same were disregarded by the bank; and that deposits were received after such action was had. (26 Am. & Eng. Ency. Law, 480; *Wallace* v. *Hull*, 28 Ga. 68;

*Walrod* v. *Ball,* 9 Barb. 271; *Coghill* v. *Boring,* 15 Cal.
219; *State* v. *Chapman,* 6 Nev. 320, 333; *Com.* v. *Barrett,*
108 Mass. 303.)

*Lewers & Henderson, R. C. Stoddard,* Attorney-General,
and *L. B. Fowler,* Deputy Attorney-General, for Respond-
ent:

On the hearing of this application, the state will rely
upon the following authorities in addition to the, author-
ities already called to the attention of the court on the
former argument:

An indictment need set forth only the ultimate facts and
allegations of evidence are improper.   (*State* v. *Chapman,*
6 Nev. 320, 330; *People* v. *Outeveras,* 48 Cal. 19; *Baxter* v.
*People,* 3 Gilman, 381.)

Section 2 of the act of March 13, 1909 (Stats. 1909, p.
95), does not limit or control the definition of the crime
set forth in section 1, but merely furnishes a ruling of
evidence creating a legal presumption upon the showing
that certain facts exist.   Section 1 of the statute makes
the knowing assent to the reception of a deposit a crime.
Section 2 provides a method of proving such assent and
also a method of proving such knowledge.   Both these
methods are intended to cover cases where actual know-
ing assent or actual knowledge of insolvency did not exist
or could not be proven.

Section 2 provides that upon the showing of certain
facts a legal presumption arises that there was assent to
the reception of a deposit and that upon the showing of
other facts, a legal presumption arises that there was
knowledge of the insolvency of the bank.   Presumptions
of law need not be averred in an indictment.   (Comp.
Laws, 4210; Beale, Crim. Pl. & Pr., sec. 93; *Spaulding* v.
*People,* 172 Ill. 40; *Com.* v. *Goulding,* 135 Mass. 552; *State*
v. *Whalen,* 98 Mo. 222.)

*Per Curiam:*

The petition for a writ of *habeas corpus* alleges an
unlawful detention and confinement of petitioner under

a bench warrant based upon an indictment charging him with assenting to the reception of a deposit of money by an incorporated bank. It is claimed that the alleged felony is not a public offense under the laws of the State of Nevada; that the act under which the indictment was found is in contravention of section 14 of article 1 of the state constitution, which provides that there shall be no imprisonment for debt, except in cases of fraud, libel, and slander; that it is not within the power of the legislature to declare the mere nonperformance of a contract of indebtedness a felony and to punish the commission thereof by imprisonment; that the statute is also in contravention of section 8 of article 1 of the state constitution, which provides that no person shall be deprived of life, liberty, or property without due process of law; that the mere assenting to a deposit by officers of a bank who are not charged with having been personally present, and without having knowledge of the alleged offense, is not a public offense; and that it is not within the legislative competency to declare it so.

The act approved March 13, 1909 (Stats. 1909, p. 95), under which the indictment was found, is as follows:

"SECTION 1. Every officer, director, cashier, managing member, manager, clerk, person, party or agent of any bank, banking corporation, association or firm, banking house, banking exchange, brokerage deposit company, private bank, and every person, company or corporation, engaged in whole or in part in banking, brokerage, exchange or deposit business, in any way, who shall accept or receive on deposit in such bank or banking institution, as aforesaid, with or without interest, from any person, any money, bank bills or notes, or certificates, or currency, or other notes, checks, bills, bonds, stocks, drafts, or paper circulating as money, when he knows, or has good reason to know, that such person, bank, banking corporation, association or firm, banking house, banking exchange, brokerage deposit company, or private bank as aforesaid, is insolvent, and every person knowing of such insolvency who shall be accessory to, or permit, or con-

nive at, or assent to, the accepting or receiving on deposit therein or thereby any such deposit as aforesaid, shall be guilty of a felony, and punished by imprisonment in the state prison for not less than one, nor more than ten years.

"Sec. 2. If any officer, director, cashier or manager of any incorporated bank, having authority to close any banking institution or to prevent the reception of deposits therein, shall not exercise such authority and prevent the receipt of deposits therein when he knows such bank is insolvent or in failing circumstances, he shall be deemed to have assented to the reception of any deposits received therein, and the failure, suspension or involuntary liquidation of any such bank or banking corporation within thirty days from and after the time of receiving any deposit therein shall be *prima facie* evidence of knowledge on the part of such officer, director, cashier or manager that such bank was insolvent or in failing circumstances at the time such deposit was received therein; *provided*, that if any director at any meeting of the directors of any such corporation held during the thirty days next preceding the failure, suspension or involuntary liquidation of any such bank or banking corporation, shall record his vote to receive no more deposits therein or to close such bank, he shall not be deemed to have assented to the reception of any deposit in such bank, within the meaning of this section."

The indictment charges that the petitioner, as the president of the Eureka County Bank, a banking corporation, organized under the laws of the State of Nevada, and conducting and maintaining its banking institution in the town of Eureka, "did then and there knowingly, unlawfully, and feloniously assent to the reception by said banking institution of a deposit of money," consisting of $60 in gold coin. The indictment contains no allegation that the defendant had any authority to close the bank or prevent the reception of deposits therein, and it is claimed that, without an allegation that the defendant had such authority and failed to exercise it, the indictment fails to allege any public offense. We understand

that it is conceded, and not denied by the state, that he had no such authority, unless it was possessed by him as a matter of law by reason of the fact that he was the president of the bank.

In *Ex Parte Pittman*, 31 Nev. 43, 22 L. R. A. (N. S.) 266, we held that the act of March 29, 1907, making it a crime to receive banking deposits knowing the bank to be insolvent, was not unconstitutional, and was not invalid as class legislation.

In *Ex Parte Rickey*, 31 Nev. 82, we held that where the accused avers that the indictment does not allege any offense, and the state admits that the facts are stated therein, the court on *habeas corpus* must consider the question whether the indictment states an offense, and if it does not the accused must be discharged, and that the court's jurisdiction in criminal cases extends only to such matters as the law declares to be criminal. At the time that case arose the statute provided a penalty against every officer of any bank who received a deposit knowing that the bank was insolvent, but did not provide a penalty against, nor make any provision regarding, the assent to the reception of deposits.

If the material facts are conceded to be alleged in the indictment, and it is not claimed that it is not properly drawn, and those facts do not constitute any offense under the statute, it would not be fair to the petitioner, nor to the state or the taxpayers of Eureka County, to remand him to custody and incur the trouble and expense of a trial, when it would have to be finally held that it was not alleged or shown that the accused had committed any acts which constitute an offense under the statute. There is an allegation that the petitioner received the deposit, but none that he received it for the bank, or for himself, or personally, or at Eureka County, or at any designated time or place. This allegation does not include any of the ordinary and necessary facts which charge the petitioner with being guilty of receiving personally the deposit for the bank knowing that it was insolvent. We understand that it was not made for the purpose of charg-

ing, and there is no contention, that the petitioner actually received the deposit for the bank. If this allegation was intended as a material one, or if it is claimed that it has any effect, it is on the theory that the actual receipt by some other officer or agent of the deposit in the bank was in law a receipt or an assent to the receipt by the petitioner, although he may not have been present.

The only offense sought to be set out in the indictment is that of assenting to the reception of a deposit, and the important question to be determined relates to what constitutes the offense of assenting to the reception of a deposit by an officer of an incorporated bank when the deposit is not actually taken by him, but is received by another acting for the bank. The indictment in the Rickey case charged that the deposit was received by the president of the bank, but alleged that it was received by and through the receiving teller. An attempt was made to hold the president of the bank criminally responsible for the receipt of the deposit. It was desired to have his legal responsibility in this regard determined upon petition for a writ of *habeas corpus*, and the facts which could be proved were conceded, in order that, if it were determined that he was not legally responsible for the act of the teller in receiving the deposit, an expensive trial might be avoided. It was held that the receipt of a deposit by an officer or agent in a private bank was in law the receipt of a private banker, for which he was responsible, but that a deposit made in an incorporated bank was in law received by the corporation, and that the president or other officer of an incorporated bank was not responsible for the receipt of deposits by some other officer or agent of the bank.

Applying to the language of the act of the legislature quoted above the ordinary rules of construction that the intention of the legislature controls the courts and should be ascertained and followed, that effect should be given to all the language of an act as far as possible, that penal statutes must be liberally construed in favor of the individual, that a special provision will control as against a

general one, and that when two provisions are irrecon-
cilable the last one controls as being the later expression
of the legislative will, what are the essential elements to
constitute an officer of an incorporated bank guilty of
assenting to the receiving of a deposit?

If the act did not contain section 2, and the question
were wholly dependent upon section 1, it might be neces-
sary to determine the meaning of the language in the lat-
ter part of section 1, and more particularly whether the
words "assent to the accepting or receiving on deposit"
require some affirmative acquiescence or presence or
knowledge of the making of the deposit on the part of
the person accused in order to make him guilty of assent-
ing, or whether any officer, director, agent, or person,
including janitors, bookkeepers, typists, telegraph oper-
ators, depositors, or others, who might acquire some infor-
mation indicating that the bank was insolvent, would be
guilty of assenting to the reception of deposits in the
bank, when they had no authority or power to prevent the
reception of such deposits, or were not present, or were
far distant, and did nothing in relation to the deposit.
But the language just quoted is followed in the next sen-
tence and at the beginning of section 2 by other words
which relate more directly to and define the offense of
assenting to the reception of deposits by officers of an
incorporated bank, as follows: "If any officer, director,
cashier or manager of any incorporated bank, having
authority to close any banking institution or to prevent
the reception of deposits therein, shall not exercise such
authority and prevent the receipt of deposits therein
when he knows such bank is insolvent or in failing cir-
cumstances, he shall be deemed to have assented to the
reception of any deposits received therein."

It may seriously be questioned whether any officer of
an incorporated bank, other than one having authority to
prevent the reception of deposits, by closing the bank or
otherwise, as a matter of law, could be deemed to assent
to a reception of a deposit therein.  What other officer,
to any purpose or effect, could refuse an assent?  Does

not the word "assent," as used ordinarily in statutes, presuppose some inherent power to withhold assent? Of what force would it be, ordinarily, for a mere bookkeeper or receiving teller in a bank, for example, to express a refusal of assent to a reception by some other person of a deposit in a bank? If the word "assent," as used in this statute, carries with it a supposition of power in the person assenting to refuse that assent, then the legislature in section 2 of the act in question, has comprehended all who could assent, and it has unquestionably comprehended all who could give effective assent.

In *Cortis* v. *Dailey*, 21 App. Div. 1, 47 N.Y. Supp. 454, it was held that "assent implies permission, so that, where a sheriff did not know that a prisoner had been absent from the jail until informed of it after his death, he will not be held to have assented to an escape."

See, also, *Patterson* v. *Minn. Mfg. Co.*, 41 Minn. 84, 42 N.W. 926, 4 L. R. A. 745, 16 Am. St. Rep. 671; 1 Words and Phrases, p. 546.

The rule of evidence as to knowledge of insolvency, contained in section 2 of the act, by its terms applies only to such officers as have power to prevent deposits. There is not a case that we have been able to find where a conviction of an officer of an incorporated bank for assenting to the reception of a deposit in a bank has been sustained, where the officer did not have control over the receiver of the deposit. It may be that the legislature intended to avoid any question in this regard by expressing clearly what constituted an assent to a reception of a deposit in an incorporated bank, instead of leaving it an open question for the courts to solve after an expensive litigation. In any event, the legislature has in section 2 defined what constitutes an assent, and that is controlling on this court.

Under the rules of construction that all the language of the act is to be considered, and that the intention of the legislature is to be ascertained and followed, that a special provision will prevail as against a general one, and that a later provision will control an earlier one, it is apparent that the legislature has provided that any officer

or director of an incorporated bank, having authority to close the bank or to prevent the reception of deposits therein, who shall not prevent the receipt of deposits when he knows the bank is insolvent or in failing circumstances, shall be guilty of assenting to the reception of deposits received. Unless we ignore and set aside this later provision of the statute, which relates specifically to the assent by an officer of an incorporated bank to the reception of a deposit, the legislature has provided as one of the conditions of making the officer or director of an incorporated bank guilty of assenting to the receipt of deposits that he have the authority to close the bank or to prevent the reception of deposits.

Unless we ignore this language in section 2, and set aside this provision of the statute, which under the rules stated is a controlling one, how can we hold that an officer or director is guilty of assenting to the reception of deposits, if he was not clothed with authority to close the bank or prevent the reception of deposits, when the legislature has specifically provided that he is guilty of assenting to the reception of deposits if he has such authority and does not exercise it to prevent their reception? We feel that we cannot ignore, set aside, or repeal this provision, and hold that any officer or director of an incorporated bank is guilty of having assented to the reception of deposits therein, when he was not present at the time the deposit was made, and did not have authority to close the bank or prevent the reception of deposits, which is made by the statute an ingredient of the offense by an officer of an incorporated bank of assenting to the reception of a deposit.

The act relating to the incorporation of banks places the control in a board of directors, and there it remains unless delegated by the board. Unless specially authorized by the board of directors, the president or a director of a bank is not legally authorized to close the bank, or to prevent the reception of deposits by the bank, and is as void of power in this regard as the president or director of a railroad company to stop the operation of trains

or other business of the company. It is not claimed that the accused had been given any such authority by the board of directors.

In the Rickey case we said: "The corporation is an artificial person, a distinct legal entity. (*Edwards* v. *Carson W. Co.*, 21 Nev. 479.) The deposits received into such bank become the property of the corporation. (*Smith's Cash Store* v. *First Nat. Bank*, 149 Cal. 32, 84 Pac. 663, 5 L. R. A. (N. S.) 870.) The corporation is the principal, and its officers are its agents. Both the president and the receiving teller, acting within the scope of their authority, are agents of the same principal, and hence are not agents of each other. (10 Cyc. 771, 772, 831.) The president of a bank may, or may not, under the by-laws, or by authority conferred by the board of trustees or directors, have larger powers than a receiving teller, for example, and may even have direction and control over his acts; but this is not because he is a principal in any legal sense of the word. His acts, within the scope of his powers, are the acts of the corporation, the real principal. As an individual the president can exercise no legal power or control.

"Concerning the ordinary powers of the president of a corporation, Cook, in his work on Stock and Stockholders and Corporation Law, 716, says: 'The general rule is that the president cannot act or contract for the corporation any more than any other one director. The question has frequently been before the courts, and many decisions have been rendered in regard to it. The question seems to have arisen in many forms, and the great weight of authority holds that a president has no inherent power to represent or contract for the corporation. His duties are confined to presiding and voting as a director.'

"Judge Thompson, one of the most eminent authorities upon corporation law, and author of the chapter on corporations in Cyc., says: 'The president of a private corporation is, as the term implies, the presiding officer of its board of directors and of its shareholders when con-

vened in general meeting. The office itself, however, confers no power to bind the corporation or control its property. The president's power as an agent must be sought in the organic law of the corporation, in a delegation of authority from it, directly or through its board of directors, formally expressed or implied from a habit or custom of doing business.' (10 Cyc. 903.) 'The appointment of a president of a corporation to the office of general superintendent or manager necessarily invests him with the powers incident to that office or agency.' (10 Cyc. 909.)

"But whether acting strictly as president, or in the added capacity of general manager, he is the agent of the corporation, and not a principal. Referring specifically to the powers of a bank president, the following is from 5 Cyc. 468: 'In some cases a president receives only a nominal salary, is expected to devote only a portion of his time to the business, and is not required to exercise the same degree of care and foresight as a president who is the real head and manager, and who possesses all the authority of the cashier. He may, however, be authorized by the directors to do anything within the authority of the bank's charter, except those positive requirements that are personal and cannot be delegated; but, when he goes beyond the scope of his usual authority, it must be shown that in some way his act was authorized by the directors.' "

The following are some of the expressions made by this court which are pertinent regarding the construction of the statute before us:

"Where the language of a statute is plain, its intention must be deduced from such language, and courts have no right to go beyond it." (*State ex rel. Lewis Hess* v. *Commissioners of Washoe County*, 6 Nev. 104.)

"The duty of every court in construing a statute is to seek the legislative intent, to reach the object sought to be expressed and accomplished; but in so doing a court is bound by rules. It cannot go fishing in the minds of its members, or the legislative mind, to reach the desired

end; and the first step is, if possible, to ascertain the intent from the language of a statute, and, when that is clear and unambiguous, then inquiry stops, because the law says it shall stop." (*Virginia and Truckee Railroad Co.* v. *Commissioners of Lyon County*, 6 Nev. 69.)

"A fundamental principle in all construction is that where the language used is plain and free from ambiguity, that must be the guide. We are not permitted to construe that which requires no construction." (*State* v. *Clarke*, 21 Nev. 337, 18 L. R. A. 313, 37 Am. St. Rep. 517.)

In *Torreyson* v. *Board of Examiners*, 7 Nev. 19, it was held that "no part of a statute should be rendered nugatory, nor any language be turned to mere surplusage, if such consequences can properly be avoided."

In *Long* v. *Culp*, 14 Kan. 412, the court held that, where one section of a statute treats specially of a matter, it will prevail as to that matter over other sections in which incidental reference is made. See, also, *State* v. *Commissioners*, 37 N. J. Law, 228.

Mr. Sutherland, in his work on Statutory Construction, secs. 157, 158, 267, says: "When the legislator frames a statute in general terms, or treats a subject in a general manner, it is not reasonable to suppose that he intends to abrogate particular legislation to the details of which he had previously given his attention, applicable only to a part of the same subject, unless the general act shows a plain intention to do so. Where there is in one act, or several contemporaneously passed, specific provisions relating to a particular subject, they will govern in respect to that subject as against general provisions contained in the same acts. Where the intention is manifest, a proviso, or qualifying words or clauses found in the middle of a sentence, may be placed at the end; or, when inserted in one section, they may be applied to the matter of another section."

As said in *Hand* v. *Stapleton*, 135 Ala. 162, 33 South. 690: "The rule is, as between conflicting sections of the same act, the last in the order of arrangement will con-

trol.   (33 Am. & Eng. Ency. Law, 1st ed., pp. 310, 311; Endlich on Interpretation of Stat. 133.)"

In *Branagan* v. *Dulaney*, 8 Colo. 408, 8 Pac. 669, it was held that as between conflicting statutes the latest in date will prevail, and as between conflicting sections of the same statute the last in order of arrangement will control.

In *State* v. *Commissioners*, 36 Ohio St. 326, it was held that in so far as two sections are irreconcilable with each other effect must be given to the latter.

In *Re Richards*, 96 Fed. 935, 37 C. C. A. 634, the United States Circuit Court of Appeals held that subdivisions "c" and "f" of section 67 of the bankruptcy act (Act of July 1, 1898, c. 541, 30 Stat. 564, 565, U. S. Comp. St. 1901, pp. 3449, 3450) are antagonistic and irreconcilable, and that in any case of conflict between them the former must give way and the latter prevail.   The district court decided the same way in *Re Tune* (D. C.), 115 Fed. 906.

In *Van Horn* v. *State*, 46 Neb. 62, 64 N. W. 365, it was held that, where different parts of the same statute are in irreconcilable conflict, the last words stand and those in conflict therewith are disregarded.   (*Albertson* v. *State*, 9 Neb. 429, 2 N. W. 742, 892.)

In *Brown* v. *County Commissioners*, 21 Pa. 42, the court said:  "When two statutes are so flatly repugnant that both cannot be executed, and we are obliged to choose between them, the later is always deemed a repeal of the earlier.   This rule applies with equal force to a case of absolute and irreconcilable conflict between different sections or parts of the same statute.   The last words stand, and others which cannot stand with them go to the ground.

Bishop, in his work on Written Laws, at sections 64, 65, says:  "Where there are words expressive of a general intention, and then of a particular intention incompatible with it, the particular must be taken as an exception to the general, and so all the parts of the act will stand. And, as a broad proposition, general words in one clause may be restrained by the particular words in a subse-

quent clause of the same statute. There are assumed to be cases which will baffle all attempts at reconciling the repugnant parts. For such the doctrine is laid down that what is last in the order of the words shall nullify the irreconcilable matters before."

Other authorities holding that when two provisions are irreconcilable the last one controls, as being the later expression of the legislative will, are *Ex Parte Hewlett*, 22 Nev. 336; *Westport* v. *Jackson*, 69 Mo. App. 153; *Ryan* v. *State*, 5 Neb. 276; *Howard* v. *Railroad Co.*, 86 Me. 387, 29 Atl. 1101; *In re Yick Wo*, 68 Cal. 304, 9 Pac. 139, 58 Am. Rep. 12 (citing other California cases); Sutherland on Statutory Construction, sec. 220.

At sections 349 and 350, Mr. Sutherland says: "The penal law is intended to regulate the conduct of people of all grades of intelligence within the scope of responsibility. It is therefore essential to its justice and humanity that it be expressed in language which they can easily comprehend; that it be held obligatory only in the sense in which all can and will understand it. And this consideration presses with increasing weight according to the severity of the penalty. Hence every provision affecting any element of a criminal offense involving life or liberty is subject to the strictest interpretation; and every provision intended for the benefit of the accused, for the same humane reason, receives the most favorable construction. 'The rule that penal rules are to be construed strictly is perhaps not much less old than construction itself. It is founded on the tenderness of the law for the rights of individuals; and on the plain principle that the power of punishment is vested in the legislature, not in the judicial department. It is the legislature, not the court, which is to define a crime and ordain its punishment. * * *' A penal statute cannot be extended by implication or construction. It cannot be made to embrace cases not within the letter, though within the reason and policy, of the law. Although a case may be within the mischief intended to be remedied by a penal act, that fact affords no sufficient reason for

construing it so as to extend it to cases not within the correct and ordinary meaning of its language."

Regarding the rule that penal statutes must be liberally construed in favor of the accused, and that it must appear that he committed acts which are clearly made an offense by the statute, we said in the decision recently filed in this court in *Ex Parte Davis*, 33 Nev. 309: "In *Ex Parte Deidesheimer*, 14 Nev. 311, this court said: 'Penal laws generally prescribe what shall or shall not be done, and then declare the consequences of a violation of either requirement.  They should be plainly written, so that every person may know with certainty what acts or commissions constitute the crime.   (Bish. on Stat. Crimes, 193; Beccaria on Crimes, 22, 45; *The Schooner Enterprise*, 1 Paine 33, Fed. Cas. No. 4,499.   *  *  *'   And in *United States* v. *Wiltberger*, 5 Wheat. 76, 5 L. Ed. 37 (opinion by Chief Justice Marshall), the court says: 'It has been said that, although penal laws are to be construed strictly, the intention of the legislature must govern in their construction; that if a case be within the intention, it must be considered within the letter, of the statute.   The rule that penal laws are to be construed strictly is perhaps not much less old than construction itself.   It is founded on the tenderness of the law for the rights of individuals, and on the plain principle that the power of punishment is vested in the legislative, not in the judicial department. It is the legislature, not the court, which is to define a crime and ordain its punishment.  *  *  *  The intention of the legislature is to be collected from the words they employ.   Where there is no ambiguity in the words, there is no room for construction.   The case must be a strong one, indeed, which would justify a court in departing from the plain meaning of the words, especially in a penal act, in search of an intention which the words themselves do not suggest.   To determine that a case is within the intention of a statute, its language must authorize us to say so.'  See, also, Sedgwick on Construction of Stat. and Const. Law, 279, *et seq.;* Smith's Commentaries, 746; Bish. on Stat. Crimes, 192, *et seq.*"  (*Ex Parte*

*Rickey*, 31 Nev. 102; *State* v. *Wheeler*, 23 Nev. 152, and cases there cited.)

In *Railroad Co.* v. *People*, 67 Ill. 13, 16 Am. Rep. 599, it was said that a law applying a harsh penalty will be subject to close criticism and a strict construction. (*Randolph* v. *State*, 9 Tex. 521.)

In *Renfroe* v. *Colquitt*, 74 Ga. 619, it was held that: "When a statute may be construed so as to give a penalty, and also so as to withhold the penalty, it will be given the latter construction; and where a statute creates a new offense and provides a penalty, or gives a new right and declares the remedy, the punishment or the remedy can be only that which the statute prescribes."

It is urged that as the title of the act, in addition to making reference to the offense, states that it is for the purpose of "establishing a rule of evidence in connection therewith," section 1 is complete in itself, in that it makes certain acts an offense, and section 2 relates to matters of evidence. This contention is correct in so far as it applies to that part of section 2 which states that the "failure, suspension or voluntary liquidation of any such bank or banking corporation within thirty days from and after the receiving of a deposit therein shall be *prima facie* evidence of knowledge on the part of such officer, director, cashier or manager that such bank was insolvent and in failing circumstances at the time such deposit was received."

But we are unable to reach the same conclusion regarding the language in the fore part of section 2, that "if any officer, director, cashier or manager of any incorporated bank, having authority to close any banking institution or to prevent the reception of deposits therein, shall not exercise such authority and prevent the receipt of deposits therein when he knows such bank is insolvent or in failing circumstances, he shall be deemed to have assented to the reception of any deposits received therein." The construction contended for as applied to this last language would give the word "deemed" therein a meaning similar to "presumed." We

think the word "deemed" was used in section 2 in the sense of "adjudged." That the word has this meaning when so used has been held in a number of cases, and it is apparent that our legislature has used it to mean "adjudged," in the sense of constituting a crime, instead of a rule of evidence, more often than it has used "adjudged" to mean "adjudged."

In *Blaufus* v. *People*, 69 N. Y. 107, 111, 25 Am. Rep. 148, it was said that "deemed," as used in legislative expression, is not materially different in meaning from "adjudged" (citing Rich. Dict.).

In *Cardinel* v. *Smith*, 5 Fed. Cas. 47 (No. 2,395), the court said: "Their counsel, apparently conscious that the letter of this section was against them, sought to modify its effect, by endeavoring to show that when it declares that 'a person who shall offer or expose for sale, any of the articles named in schedule C, * * * shall be deemed the manufacturer thereof,' it only creates a disputable presumption that such person is 'the manufacturer thereof,' which, in this case, is overcome by the admitted fact that the plaintiffs are not the manufacturers, but only the venders of the articles. The word 'deemed' in this connection means 'judged,' 'determined'; and when it is enacted that the vender of an article shall for any purpose 'be deemed the manufacturer thereof,' for such purpose he is to be absolutely considered such manufacturer."

In *Commonwealth* v. *Pratt*, 132 Mass. 246, it was held that when by statute certain acts are "deemed" to be a crime of a particular nature they are such crime. See, also, *Leonard* v. *Grant* (C. C.) 5 Fed. 11, holding that "deemed" is the equivalent of "considered" or "adjudged," and *Walton* v. *Gavin*, 16 Q. B. 48.

In our general act (Stats. 1861, c. 28) relating to crimes and punishments the legislature has provided at section 56 that every person who commits certain acts "shall be deemed guilty of arson in the first degree," at section 57 that every person who commits certain other acts "shall be deemed guilty of arson in the second degree," and

that if the life of any person is lost in consequence of the burning the offender "shall be deemed guilty of murder," and in the next section that every person who commits certain other acts "shall be adjudged guilty of arson in the second degree."

Some of the many other instances in which the word "deemed" has been used in the sense of "adjudged" in that act are at section 34, wherein it is provided that, if any person shall inflict a wound in a duel which causes the death of another, "the offender shall be deemed guilty of murder in the first degree"; at section 59, where it is provided that every person committing certain acts "shall be deemed guilty of burglary"; at section 61, which provides that every person committing certain acts "shall be deemed guilty of grand larceny"; at section 62, where it is provided that every person committing certain acts "shall be deemed guilty of petty larceny"; at section 77, where it is provided that every person committing certain acts "shall be deemed guilty of forgery"; at section 78, where it is provided that every person committing certain acts "shall be deemed guilty of counterfeiting"; at section 90, wherein it is provided that every person who does certain false swearing "shall be deemed guilty of perjury"; at section 91, wherein it is provided that every person who by wilful and corrupt perjury shall procure the conviction and execution of any innocent person "shall be deemed and adjudged guilty of murder"; at section 127, wherein it is provided that a certain act "shall be deemed the commission of the crime of bigamy"; and at section 136, wherein it is provided that every person guilty of certain acts "shall be deemed a swindler."

In an act entitled "An act to more fully define the crime of larceny" (Stats. 1883, c. 23) it is provided in section 1 that every person doing certain acts "shall be deemed guilty of grand larceny," and in section 2 that every person doing certain acts "shall be deemed guilty of petty larceny."

In an act to prohibit the killing and branding of live

stock (Stats. 1879, c. 104) it is provided that every person doing certain acts "shall be deemed guilty of felony."

It is also urged that under the indictment the petitioner may be held and tried as an accessory before the fact under our statute, which makes accessories before the fact principals.  This might be true if the indictment alleged the reception of a deposit by the petitioner, and evidence was at hand to show that, although he had not actually received the deposit, he was accessory before the fact to the reception of the deposit.   But this indictment fails to allege facts constituting any offense by a principal, either in the reception of a deposit or in the assent to the reception of a deposit, and the conclusion follows that, if the indictment does not allege any facts which would constitute an offense by a principal, it does not state sufficient facts as against an accessory before the fact so that he could be tried as a principal.

As the statute provides that an officer having power to close a bank or to prevent the reception of deposits, who does not exercise such authority, shall be deemed guilty of assenting to the reception of a deposit, if the authority to close the bank or to prevent the reception of deposits, as designated by the legislature, is necessary to constitute the offense of assenting to the reception of a deposit so that a principal may be guilty, this same authority must be necessary to constitute the same offense in order to make an accessory before the fact guilty.   For if it be conceded that an accessory before the fact may be indicted, tried and convicted as a principal, the necessary elements which constitute the offense are not less in regard to him than the ones which apply to the principal, except as they relate to some act or omission connected with the perpetration of the crime.   Hence section 10 of the act relating to crimes and punishments, which provides that an accessory is one who aids, abets, or assists, or who, not being present, aiding, abetting, or assisting, has advised and encouraged the perpetration of the crime, and that he "who thus aids, abets or assists, advises or encourages, shall be deemed and considered as principal

and punished accordingly," does not apply, nor make good, as against an accessory before the fact, an indictment which does not state facts sufficient to constitute an offense against a principal. If it be said that one who advises, aids, or assists in the commission of a crime, so as to make him an accessory before the fact, assents to its commission, he may properly be prosecuted as such accessory under an indictment charging him with the commission of the offense as a principal, or in case of a deposit with the reception, regardless of any provision of the statute relating to the assent to the reception, of a deposit. (*State* v. *Chapman,* 6 Nev. 320; *State* v. *Laurie,* 13 Nev. 386.)

In some of the states the receiving or assenting to the reception of deposits in a bank knowing it to be insolvent has not been made criminal. In other states the reception of the deposit only, and in others both the reception and assent to the deposit are made criminal, under penalties varying from misdemeanor with fine in twice the amount of the deposit, or other light punishment, to felonies with varying terms in the state prison. As pertains to incorporated banks, our statute has penalized the reception of deposits by any person who knows, or has good reason to know, that the bank is insolvent, and has also penalized the assent to the reception of deposits by any officer, director, cashier, or manager having authority to close the bank, or to prevent the reception of deposits, who does not prevent such reception when he knows the bank is insolvent or in failing circumstances. As these officers when they have this authority are made guilty when they fail to prevent the reception of deposits knowing the bank is insolvent or in failing circumstances, evidently the legislature did not intend to make them guilty of assenting to the reception of deposits when they do not have this authority, unless they actually receive the deposit. Would to hold otherwise under this statute be equivalent to holding that all the directors, whether three or fifteen, and all officers of an incor-

porated bank, without its authority, who may become aware, or have good reason to believe, that it is insolvent, may be convicted of assenting to the reception of a nominal or other amount by some other person in their absence and without their knowledge, and be imprisoned under sentences aggregating 100 or 200 years?

If the specific provision in section 2 that officers having power to close the bank or prevent the reception of deposits shall be deemed guilty of assenting to the reception of deposits if they fail to exercise this authority, had been omitted from the statute, or could be ignored, still there is nothing in the language of section 1, nor in the law, which makes an officer of an incorporated bank criminally liable simply because he is such officer and knows that the bank is insolvent, and without anything being done on his part deposits are being received by some other officer or person for the bank.

Under the allegations of the indictment, which appears to have been carefully drawn, and which allegations, we understand from the admissions by the prosecution, state the correct facts, it does not appear that they constitute any offense known to the law. However, if the state or the grand jury has any evidence which would bring the case under the terms of the statute, or show that the defendant had authority to close the bank or prevent the reception of deposits therein when he knew the bank was insolvent and in failing circumstances, or if they have any evidence that he actually or personally received any deposit for the bank when he knew it was insolvent and in failing circumstances, or that he was an accessory to such reception under section 10 of the act covering crimes and punishments and the decisions of this court concerning the same, a new indictment alleging the necessary facts may be found, and, if so found, it will not be prejudiced or affected by the order in this proceeding.

The petitioner will stand discharged from the indictment.